# Lennon Declaration
# Exhibit 2

Lennon Declaration

Exhibit 2

----------------------------------------------------------------
In the Matter of the Arbitration

       between

Kondot S.A.,

                      Claimant

                              **Partial Final Award**
                              August 17, 2020

        and

Duron LLC,

                      Respondent

arising under a Charter Party of the
M/V HANZE GENDT dated April 17, 2020
----------------------------------------------------------------

Before:             Louis Epstein
                     David Gilmartin
                     David W. Martowski, Chairman

Appearances:

                  On behalf of  Kondot S.A.
                  Lennon Murphy & Phillips, LLC
                  by: Patrick F. Lennon, Esq. and
                     Kevin J. Lennon, Esq.

                  On behalf of Duron LLC
                  Holland & Knight LLP
                  by: Vincent J. Foley, Esq.,
                     Adolfo E. Jimenez, Esq. and
                     Clayton J. Vignocchi, Esq.

**Introduction**

Claimant Kondot S.A. ("Kondot") requests an emergency partial final award confirming its justification for the termination of the Charter Party dated April 17, 2020 of the M/V HANZE GENDT ("Vessel") between Kondot, as Disponent Owner, and Respondent Duron LLC ("Duron"), as Charterer.

**The Parties and other transactional entities**

Kondot is an international ocean carrier with offices at Hunkins Waterfront Plaza, Suite 556, Main Street, Charlestown, Nevis. Duron is an international commodity trader with offices at 3771 SW 27th Ln., Miami, Florida. Hansen-Mueller Co. ("HM") was supplier of the cargo in question with offices at 12231 Emmet Street, Suite 1, Omaha, NE.  Empresa de Apoyo de Producción de Alimentos ("EMAPA") is a Bolivian governmental entity that procures Bolivia's food needs and is headquartered in La Paz, Bolivia. Ecubol LLC ("Ecubol") is a commodity broker with offices at 328 Crandon Boulevard, Suite 208, Key Biscayne, Florida.

**The Charter Party [1]**

On April 17, 2020 Kondot entered into a North American Grain Charter Party 1973 (Norgrain 89) and Rider Clauses ("Charter") with Duron for the carriage of 30,000 MT 10 pct moloo of wheat in bulk on board the Vessel from Galveston, Texas to Matarani, Peru and/or chopt Puerto Cabello, Venezuela, on a freight prepaid basis with an option of switching bills of lading. Clause 45 provided for the arbitration of disputes at New York subject to U.S. law in accordance with the rules of the Society of Maritime Arbitrators, Inc. Addendum No. 1 dated April 30, 2020 changed the loading port from Galveston to Houston. [2] The parties subsequently entered into Addendum No. 2 [3] and Addenda No. 3 (also referred to as an "interim agreement" [4], which are discussed in detail below.

---

[1] Kondot Ex. 1.

[2] Kondot Ex. 1A.

[3] Kondot Ex.11.

[4] Kondot Ex. 29.

**Procedural History**

Kondot commenced this arbitration on July 2, 2020 by serving Duron with its Demand for an Emergency Arbitration and the nomination of Louis Epstein on its behalf. Kondot also filed an action in the U.S. District Court for the Eastern District of New York seeking in addition to other relief, an order compelling Duron to appoint its arbitrator. Duron retained counsel Holland & Knight and on July 16, 2020 responded with the nomination of David Gilmartin. On July 17, 2020 Messrs. Epstein and Gilmartin appointed David Martowski as Panel Chairman. The Panel made its disclosures and on July 19, 2020 counsel confirmed acceptance of the Panel as constituted.

The parties unsuccessfully attempted to resolve their differences, an expedited submission schedule was agreed upon, and the following exceptionally detailed submissions were made:

- July 24, 2020 Kondot's Submission in Support of its Request for Emergency Arbitration Award Confirming Termination of the Charter Party with Exhibits 1-31 ("Kondot Submission");
- August 3, 2020 Duron submitted its Response with Exhibits A-W ("Duron Response");
- August 5, 2020 Kondot submitted its Reply to Duron's opposition ("Kondot Reply') and the Witness Statement of Milind Trilokekar;
- August 7, 2020 Duron submitted its Rebuttal Statement to Kondot's Reply  and Supplemental Witness Statement ("Duron Rebuttal"); and
- Both parties submitted detailed chronological statements of facts.

Kondot requested an emergency oral argument which was held on August 12, 2020 at a virtual proceeding. Further procedural submissions were made and the evidentiary phase of this proceeding was formally closed on August 14, 2020.

**Factual Background**

The relevant facts in this case are largely undisputed and may be summarized as follows:

1. On April 8, 2020, Duron entered into a Purchase Order Agreement (the "Duron-Ecubol Contract") to sell to Ecubol on a CIF Matarani basis a total of 60,000 MT of wheat at a price in two shipments of 30,000 MT each at a price of $263 per MT.[5]

2. On April 23, 2020,  pursuant to an award under a Bolivian government tender, Ecubol entered into a Purchase Order Agreement (the "Ecubol-EMAPA Contract") to sell to EMAPA on a CIF Matarani basis  60,000 MT of  wheat at a price of $311 per metric ton in two shipments of 30,000 MT each on terms which, apart from price, were  more or less back to back with the terms of the Duron-Ecubol Contract .[6]

3. On April 17, 2020, Duron as Charterer and Kondot as Owner entered into the Charter which, as noted above, provided for loading of the cargo in Galveston Texas with a laycan 23-28 April and conferred upon the charterer the option to discharge the cargo in either Matarani, Peru or Puerto Cabello, Venezuela, with the freight rate varying depending upon which option was declared and when.[7]

4. On April 30, 2020, the parties entered into Addendum No. 1 to the Charter which, among other things:
   • changed the loading port from Galveston to Houston, City Docks where the cargo was expected to be ready on May 4, 2020,
   • provided for Charterers to pay (a) detention at $10,500 per day pro rata from April 23, 2020 (when, apparently, the Vessel arrived at Galveston) "until Owners order pilot to shift from Galveston to Houston,City Docks"   and (b) costs incurred at Galveston, and
   • increased the freight for both optional discharge ports. [8]

5. On May 8,  2020, the Vessel completed loading a cargo of 29,997.551 metric tons of "hard red winter wheat" and bills of lading were issued for the voyage naming Ecubol LLC as the shipper and Emapa Bolivia as the Consignee and identifying Matarani Peru as the discharge port.[9]

6. On May 11, 2020, Duron  paid to Kondot $793,656.68 in freight.[10]

---

[5] Ex. H.

[6] Ex. I.

[7] Ex. 1.

[8] Ex. 1A

[9] Ex. 3.

[10] See Ex. 16 containing Kondot's Provisional Freight Statement to Duron.

7. Duron purchased the wheat from HM at a price of $229.01 per metric ton for a total of of $6,869,808.29.[11]   On May 20, 2020, Duron made a payment on account to HM of $400,000.[12] No further payments have been made by Duron to HM and as of July 17, 2020, the outstanding balance owed by Duron to HM, including various deductions and additional charges, was $6,557,324.53.[13]

8. The cargo loaded on board the Vessel was intended to be the first of two  shipments under the Duron-Ecubol Contract which Ecubol would in turn supply to EMAPA. However, on May 12, 2020, the Ecubol-Emapa Contract was canceled.[14] According to Duron, direct discussions between Duron and EMAPA to try to revive the contract were unsuccessful, in part because it would have required Duron to conceal the terms of the transaction, make an illicit payment to Ecubol and provide a kickback to a Bolivian government official, which Duron refused to do.[15]  Duron further asserted that it had been fraudulently induced to ship the cargo based on false assurances of payment by Ecubol.[16]

9. On May 23, 2020 at 5:06 hours,[17] the Vessel arrived at Matarani, Peru, its port of destination and waited for orders to discharge.  Duron failed, however,  to comply with its obligation to discharge the cargo there as its sale to Ecubol had fallen through.

10. On May 29, 2020, Duron and Kondot entered into Addendum No. 2 to the Charter which provided as follows:
    - The Vessel is to sail from Matarani towards Puerto Cabello. Vessel to proceed to Puerto Cabello for discharge of the entire cargo
    - Time from vessel's arrival Matarani (5/23/20 at 05:06 hours local time) to vessel's sailing Matarani to count uninterrupted as detention at the rate of $11,600 gross with 5% total commission your end
    - Charterers to pay Owners U.S.$ 365,500 lump sum. This amount is subject to 5% commission your end
    - Should the above mentioned Matarani detention and $365,500 lump sum not be in Owner's account by the time vessel arrives in Balboa, the vessel is to drop anchor until funds are received. Time spent at

---

[11] See  Ex. F, HM's invoice to Duron dated July 17, 2020

[12] Id.

[13] Id.

[14] Ex. L, a May 12, 2020 letter from EMAPA to Ecubol stating that the contract has been cancelled.

[15] Duron Response at 7-8.

[16] Id. at 7.

[17] See Exhibit 16, Provisional Freight Statement.

Balboa in excess of 2 days to be for Charterer's account at the rate of $11,600 per day pro rata. Time to count uninterrupted from vessel's arrival Balboa until transit eastbound is initiated. It is understood that Owners will not pay Panama canal crossing fees until funds from Charterers are received and any transit delays that may result from late payment for crossing the canal shall count as detention

- Any detention accrued in Panama to be paid to Owners before breaking bulk in Venezuela
- Vessel to be free disbursement accounts in Venezuela (the $90,000 deduction mentioned in the original recap is no longer applicable). Charterers to place agent in funds prior to vessel's arrival Puerto Cabello
- Charterers/Receivers waive any right, and shall hold Owners harmless, for claims over condition of the cargo, exact wording to follow
- The procedure for changing "old" bills of lading for "new" bills of lading to be as per original fixture.[18]

11. On May 30, 2020 at 7:42 hours, the Vessel sailed from Matarani. In accordance with Addendum No. 2, the detention for the time spent at Matarani was 7.1 days at $11,600 per day for a total of $82,456.87.[19]

12. On June 5, 2020 at 10:21 hours, the Vessel arrived at Balboa.[20]   The $365,000 lump sum freight had not been paid by the time of the vessel's arrival. Therefore, the vessel dropped anchor to await payment before transiting the Panama Canal to Puerto Cabello, the agreed destination for discharge of the entire cargo.   On June 15, 2020, Kondot, through counsel, sent a demand for payment of the amounts due under Addendum 2.[21]   However, no payment was made.

13. On June 18, 2020, Duron, through its broker Mid Ship proposed to again change discharge ports from Puerto Cabello  to Maracaibo and Cumana, Venezuela.[22] The parties engaged in negotiations for a possible further addendum to this effect[23] but no such addendum was ever agreed.

14. On June 23, 2020, Kondot again wrote to Duron providing a Statement of Account reflecting additional freight and accrued detention charges agreed under Addendum

---

[18] Ex. 1A.
[19] See Ex. 16, Provisional Freight Statement,,
[20] Id.
[21] Ex. 12.
[22] Ex. 13.
[23] Ex. 14 - 15.

No. 2 (with a somewhat higher freight reflecting the proposed change in discharge to two ports in Venezuela) and urging Duron to make payment as previously agreed.[24] Kondot further noted that due to the Vessel sitting at anchor for more than 30 consecutive days, the hull was likely fouled and hull cleaning would be for Duron's account.[25] As of June 23rd the total detention accrued at Balboa amounted to $180,597.50.[26] Together with the outstanding lumpsum freight for the proposed voyage to Maracaibo and Cumana, as well as detention and expenses accrued at loadport, the total balance due to Kondot at that point amounted to $620,143.83.[27]

15.  On July 1, 2020, the vessel was still at anchor in Balboa.  Duron had given no orders for the vessel to proceed either to Puerto Cabello as agreed in Addendum No. 2 or to Maracaibo and Cumana as Duron had subsequently proposed.   Duron had not paid the amounts agreed under Addendum 2 or any part thereof.

16. On July 1, 2020, Duron  was seeking to arrange the inspection of the cargo on board the vessel.[28]   HM became aware of this, contacted Kondot through a broker, and advised as follows:

> As everyone is aware from the Sonchia Chartering's email of May 15, 2020 Hansen-Mueller Co has never been paid for the 29,997.551 metric tons of Hard Red Winter Wheat onboard the M/v Hanze Gendt. After numerous assurances from Duron LLC. Miami Florida that payment was forthcoming, to date ( July 1, 2020) the payment of about USDollars 6.9 million , plus interest and legal fees has not been remitted by Duron LLC to Hansen-Mueller Co to pay for this wheat cargo and OWNERSHIP remains with Hansen-Mueller Co.
>
> Duron LLC has endeavored to sell this wheat to GSI International Dominican Republic for unloading in Venezuela. Duron LLC again assured Hansen-Mueller that GSI International would be pre-paying disponent Owners ( Kondot ) for the outstanding freight damages, detention and other outstanding obligations to Kondot, and also for TOTAL outstanding obligations to Hansen-Mueller Co for wheat, interest and legal fees. This seems to be an obligation that is not getting finished ?
>
> The request for cargo inspection of the 29,997,551 metric tons of Hard Red Winter wheat is not allowed by the owners of the cargo Hansen-Mueller Co. and Hansen-Mueller Co. will not allow owners (actual

---

[24] Ex. 16.

[25] Id.

[26] Id.

[27] Id.

[28] See Ex. 18.

owners of vessel) , Kondot ( Disponent owners) , Duron LLC or GSI International to inspect, grade or in any way open vessel's hatches for any reason.

Hansen-Mueller Co. will hold owners of the Hanza Gendt fully liable for any and all damages if for any reason the vessel allows the hatches to be opened, cargo inspected or any testing arranged by anyone other than Hansen-Mueller Co. All the Hard Red Winter wheat was at loading port ( Houston Texas) inspected , and quality assured by FGIS, USDA, and SGS inspections for loading under United States Grain Export Regulation. No further inspections or quality study is required for the grain.

Hansen-Mueller Co hopes that Owners, and Disponent owners ( Kondt) understand that cargo is still under the ownership of Hansen-Mueller Co and that irrespective of charterers ( Duron LLC)  request, Hansen-Mueller will not allow that hatches ever be opened, cargo can not be unloaded, cargo can not be allowed to enter into any country including Venezuela without the express approval of Hansen-Mueller Co.[29]

17. By email on July 1, 2020, counsel for Kondot demanded that Duron provide adequate assurance of performance in the following form:

> 1. Proof of remittance of $500,000 to Owners' bank account by 1100 hours (EDT) on July 2, 2020 to be applied against the attached Statement of Account (the remittance of this amount is exclusive of further/future expenses that may be for Charterer's account); and
>
> 2. Voyage instructions will be provided by no later than 1200 hours (EDT) on July 3, 2020 (* - subject to an agreement on the relevant compensation for proceeding with same).
>
> Should Charterers fail to provide the demanded adequate assurances, Disponent Owners reserve the right to declare Charterers in repudiatory breach of the charter party, and to terminate the charter party and the right to commence legal proceedings to discharge and sell the cargo in mitigation of further loss and damage for all concerned parties. [30]

18. On July 2, 2020, having received no response from Duron to the request for adequate assurance, counsel for Kondot again wrote to Duron via Mid Ship requesting a response

---

[29] Ex. 18A.

[30] Ex. 17.

by 3:00 pm that day.[31]   Duron did not  provide the assurance of performance that Kondot requested.  Instead, by email that day, Duron requested further patience from Kondot while it attempted to conclude a contract with EMAPA which would have involved the vessel returning to Matarani, Duron stated:

> charterers still working on solving this unwanted issue and would like to share with owners that today the option to discharge in Venezuela is losing traction, however EMAPA have posted in public that Duron have been awarded with the cargo that we have fixed /have onboard of mv Hanze Gendt , therefore charterers are working via their legals on finalizing pending documents to conclude with this process soonest and to have a rapid conclusion of this voyage. charterers have to ask owners to maintain patience as we are waiting to hear from our buyer when all satisfactory documents will be completed as well as when funds will be allocated. [32]

19. On July 2, 2020, Kondot commenced this arbitration.[33]  In the following days, Kondot continued to urge Duron to perform its contractual obligations.[34] On July 8, 2020, Duron requested further patience from Kondot stating that on that day it expected to have a signed contract with EMAPA, that if the contract were signed that day, EMAPA would have 72 hours to open a letter of credit and that after the letter of credit was open, Duron would be able to "start the process to collect payment and in turn be in a position to fully satisfy the outstanding cost we have incurred with the vessel as a result of this  deviation."  Duron further stated that it "will make confirm the transfer of usd 150,000 on by tomorrow  Jul 9 2020.".[35]

20. On July 9, counsel for Kondot confirmed to Duron that the promised  payment of $150,000 had not been received and repeated that Duron remained in repudiatory breach of the charter party.[36]

21. On July 9, 2020, a sale contract was signed between Duron and EMAPA.[37]  It provided for opening of a letter of credit maximum 72 working hours after signing of the contract.  On or about July 10, 2020, an application for issuance of a letter of credit was signed by EMAPA[38]

---

[31] Ex. 19.

[32] Ex. 20.

[33] Ex. 21.

[34] Ex. 22-23.

[35] Ex. 25.

[36] Ex. 27.

[37] Ex. N.

[38] Ex. O.

22. As noted above, on July 14, 2020, Kondot filed an action in the U.S. District Court for the Eastern District of New York seeking, *inter alia*, an order compelling Duron to appoint its arbitrator. Duron retained Holland & Knight as counsel and on July 16, 2020 appointed its arbitrator.

23. On July 20, 2020, a letter of credit was issued by the Central Bank of Bolvia[39] However, it contained a provision unsatisfactory for Duron, requiring presentation of a "Certificate of Quality(Destination) issued by SGC [sic]." [40] It also contained a requirement for presentation of a bill of lading marked "freight prepaid."[41]

24. On July 24, 2020, the parties through counsel reached the following agreement:

> 1. Duron LLC will make an unconditional payment on account to Kondot S.A. in the amount of $500,000 within one (1) business day of agreement.
>
> 2. Upon receipt of the $500,000, credited to Kondot S.A.'s account, Kondot S.A. will make immediate arrangements to clean the vessel's hull, re-bunker the Vessel at Balboa and to thereafter commence sailing to Matarani.
>
> 3. The $500,000 payment by Duron LLC to Kondot S.A. shall be applied to accrued, outstanding detention charges reflected in the attached Statement of Account.
>
> 4. All accrued and future detention shall be invoiced by Kondot S.A. to Duron LLC at the rate of $11,020 (net of commission).
>
> 5. The parties will execute a third addendum to the charter party as follows:
>
>> a. changing the discharge port back to Matarani;
>>
>> b. stipulating the amount of lump sum freight to be paid by Duron LLC to Kondot S.A. for the round trip Matarani/Matarani (amount to be agreed commercially); and
>>
>> c. conferring Kondot S.A. a lien on the cargo for all outstanding freight, detention and demurrage (if any).

---

[39] Ex. R.

[40] Id.

[41] Id.

6. Duron LLC will issue a letter of indemnity to Kondot S.A. indemnifying it against cargo loss or damage arising due to conditions during the detention period.

7. Duron LLC will pay all outstanding and accrued amounts of detention, as invoiced by Kondot S.A., within 72 hours of the Vessel's arrival at Matarani and issuance of notice of arrival.

8. The parties' agreement on the foregoing terms shall be made without prejudice to either party's claims, defenses, rights or remedies in the pending arbitration, which arbitration shall be stayed pending arrival of the Vessel at Matarani.[42]

25. On July 27, 2020, the Central Bank of Bolivia issued another letter of credit in favor of Duron which eliminated the requirement to present a discharge port Certificate of Quality.[43] However, the second letter of credit  retained the requirement for presentation of a "freight prepaid" bill of lading.[44]

26. Meanwhile, Duron failed to comply with its  July 24, 2020 agreement to make an unconditional payment on account of  $500,000 within one business day – i.e. by July 27, 2020.[45]

27. On July 28, 2020, Kondot sent the following notice to Duron through brokers:

Please let this notice serve as Kondot's acceptance of Duron's total material breach and repudiation of the m/v Hanze Gendt charter party dated 17 April 2020. Specifically, (i) Duron's failure to issue lawful cargo discharge instructions at Matarani; (ii) Duron's failure to remit the $365,000 lump sum freight payment following vessel's arrival to Balboa under Addendum II dated 29 May 2020; (iii) Duron's failure to provide adequate assurance of performance as demanded; and (iv) Duron's failure to remit $500,000 under Addendum III dated 24 July 2020.

Kondot is obtaining confirmation of its acceptance of Duron's total material breach and repudiation as aforesaid from the New York arbitration tribunal. Thereafter, Kondot will arrange for discharge and sale of the cargo. Kondot reserves its rights to seek and recover damages

---

[42] Ex. 29.

[43] Ex. T.

[44] Id.

[45] See Ex. 30.

from Duron for all losses incurred under the charter party within the arbitration. Please be guided accordingly.[46]

**Issue for Determination**

Did Kondot validly and justifiably  terminate the Charter under the circumstances?

**The Parties' Contentions**

**Kondot contends** that Duron repeatedly breached its contractual obligations and undertakings by, *inter alia*: 1) failing to provide lawful discharge instructions after the Vessel arrived at Matarani; 2) failing to pay the agreed lump sum freight of $365,000 pursuant to Addendum No. 2 following the Vessel's arrival at Balboa and $82,456.87 in detention for the vessel's stay at Matarani; 3) failing to provide adequate assurance of performance as Kondot reasonably requested in good faith due to Duron's multiple breaches of the Charter and legitimate questions concerning Duron's financial solvency and ability to perform under the Charter; 4) failing to remit an agreed unconditional payment on account in the sum of $500,000 pursuant to an  agreement negotiated on July 24, 2020; and 5) failing to perform in good faith its charter party obligations.

Kondot cites authorities in support of its position that: Duron repudiated its obligations by failing to provide adequate assurance of performance; [47] Duron's repeated charter party failures constituted anticipatory repudiation ; [48] Duron's failures were a "total breach" of the Charter; [49] and Duron breached the Charter's implied covenant of good faith performance. [50] Accordingly, Kondot requests an emergency Partial Final Award in the form of a declaratory ruling that it was entitled to terminate the April 17, 2020 Charter.

---

[46] Ex. 31

[47] *The Opal Star,* SMA No. 3650 (2000); *The Regal Sword,* SMA No. 1682 (1982); *Reprosystem, B.V. v. SCM Corp., 630 F.Supp. 1099, 1101 (S.D.N.Y.);* and *Voyage Charters (3d Ed.)* at 639, Section 21.208.

[48] *The Aton V,* SMA No. 3094 (1994); *The Novodruzhesk,* SMA No. 3427 (1998); *The Opal Star, supra.;*  and *The TBC Prestige,* SMA No. 4368 (2019).

[49] *The Opal Star, supra; The Kinzan Maru,* SMA No. 3465 (1998); and *Forsyth Maritime Ltd. v. Apex Oil Company,* SMA No. 1693 (1982).

[50] *The M/T Stolt Dimitris*, SMA No. 1299 (1978).

**Duron contends** as a threshold procedural issue that this Panel is not empowered to decide this emergency application under the SMA Rules. On the merits, Duron argues that: Kondot wrongfully refused to issue new bills of lading and return to Matarani unless Duron complied with its demand to pay accrued detention at Balboa in advance; this was contrary to the parties' agreement in Addendum No. 2 that payment would be due "before breaking bulk in Venezuela"; Kondot's actions unjustifiably delayed and obstructed Duron's performance and "ultimately destroyed Duron's contract of sale with EMAPA;" Kondot refused to accept Duron's assurance and confirming documents although it had sufficient security based on its possession and control over cargo worth in excess of $7 million; instead, Kondot chose to initiate these proceedings on an emergency basis, as well as filing Rule B actions in New York and Texas courts, and a third arrest proceeding in Panama; Kondot's refusal to return to Matarani constituted an "unjustifiable deviation" and wrongful failure to follow Duron's voyage orders, and its threat to exercise an alleged lien on the cargo is not supported by the Charter's lien clause.

Duron cites authorities in support of its positions that it provided adequate assurance of performance by establishing a firm publicly disclosed contract with EMAPA with secure payment by Letters of Credit; [51] Kondot's demands for assurance contrary to the Charter were not reasonable or justified and Duron's refusal to comply with such unlawful demands do not constitute a repudiation; [52] Kondot is in total breach for its failure to comply with Duron's voyage orders causing frustration of the Charter; [53] Kondot's conduct in remaining at anchor in Balboa to collect a detention payment despite voyage orders to proceed to Matarani was an "unjustified deviation" contrary to Clause 34 of the Charter; [54] and Kondot breached its duty of good faith and fair dealing to Duron by demanding detention payments and obstructing Duran's

---

[51] Distinguishing *The Opal Star, supra.*

[52] *Central Salt, LLC, v. Alpha Commodities SARI,* SMA No. 4353 (2018), quoting *Joqueviel & Cathala v. Eastern Training Co.,* 1989 WL 119440 at 4 (E.D.N.Y. Sept. 28, 1989); and *The Regal Sword,* SMA No. 1682 (1982).

[53] *Restatement 2d of Contracts*, Section 251, and *The Regal Sword, supra.*

[54] *United Nations Children's Fund v. S/S Nordstern, 251 F.Supp. 833, 836 (S.D.N.Y.) 1965);* and *Dow Chem. Pac. V. Rascator Mar. S.A.,* 782 F.2d 329 (2d Cir. 1986).

compliance with multiple Rule B actions attaching Duron's funds which were needed to make payments. [55]

Accordingly, Duron seeks an order from the Panel: (1) Declaring that Charterer provided adequate assurances of performance to Owner when the Vessel was at anchor in Balboa and under orders to proceed to Matarani by Charterer establishing a firm (public record) contract for sale of the cargo to consignee EMAPA, and documentation supporting a letter of credit from EMAPA and in favor of Charterer (upon presentment of original bills of lading); (2) Declaring Owner to be in "total breach" of the Charter for failure to follow Charterer's lawful voyage orders to proceed to discharge in Matarani as of July 8, which frustrated the Charter by destroying the established replacement sale of the cargo to EMAPA resulting in damages to Charterer, costs, expenses, and attorney's fees of this arbitration, and all costs, expenses and all attorney's fees incurred by Duron to defend multiple Rule B actions to attach its property all in an amount to be determined at a subsequent stage of this arbitration; (3) Instructing Owner to immediately discontinue and/or dismiss with prejudice the pending Rule B proceedings against Duron, and release any property of Duron subject to arrest or attachment; and 4) Instructing Owner to immediately proceed to Matarani and issue new bills of lading in the event Charterer is able to restore its contract with EMAPA and a new letter of credit is issued ensuring Owner any amount it may be due less any damages awarded to Duron by this Panel to avoid losses that would result if Cargo is subject to a distressed sale. Duron requests that Kondot's application be denied and reserves its rights to bring claims and offer evidence outside of these proceedings.

---

[55] *The M/T Stolt Dimitris,* SMA No. 1299 (1978) and *Williston on Contracts ( 3d Ed.) at 670 at p. 159.*

**Discussion and Decision**

The Panel has carefully considered the facts and the parties' cited authorities and unanimously grants Kondot's application for a Partial Final Award confirming its rightful termination of the Charter dated April 17, 2020, for the following reasons.

As noted above, the facts in this case are largely undisputed.  Among other things,  they show the breach by Duron of its contractual obligations at every stage of performance.

When the Vessel arrived at Galveston on April 23, 2020, Duron had  no cargo available to load there.  On April 30, 2020, the parties entered into Addendum 1, providing that Duron would supply a cargo expected to be ready in Houston on May 4, 2020 and  providing for payment by Duron of detention for the period of delay at Galveston and for shifting to Houston.

When the Vessel arrived at Matarani, Peru on May 23, 2020, Duron  failed to comply with its obligation to discharge the cargo there  as its sale to  Ecobul had fallen through and it  had no buyer to receive it.   Instead, on May 29, 2020, the parties entered into Addendum No. 2 pursuant to which Duron agreed to discharge the entire cargo in Puerto Cabello, Venezuela and to pay in advance, before the Vessel transited the Panama Canal,  the agreed lumpsum freight for the voyage to Puerto Cabello together with all amounts owed for detention at Matarani,    It was agreed that if these amounts were not paid by the time of the Vessel's arrival at Balboa,  the Vessel would drop anchor and wait there until such time as payment was made, with detention accruing.  Despite Kondot's repeated demands, no payment of any part of these amounts was ever made..

By June 18, 2020, it became evident that Duron had no customer for the cargo in Puerto Cabello, the port where Duron had agreed  to discharge the entire cargo.  Duron was therefore in breach of its obligations under Addendum No. 2.   On that date, Duron proposed to change the destination again, this time to a two-port discharge at Maracaibo and Cumana, Venezuela.

By June 23, 2020, the cargo had been on board the Vessel for more than a month and the total balance due  from Duron to Kondot amounted to $620,143.83.  On July 1, 2020, the Vessel was

still at anchor in Balboa. Duron had given no orders for the Vessel to proceed either to Puerto Cabello, the discharge port agreed in Addendum No. 2, or to Maracaibo and Cumana as more recently proposed but not yet agreed.   Duron had not paid the amounts agreed under Addendum 2 or any part thereof.

**Duron's Failure to Provide Adequate Assurance of Performance**

In the *Opal Star*,[56] the Panel described the doctrine of adequate assurance of performance as follows:

> The doctrine of Adequate Assurance is grounded on the principle that a party to a contract is entitled to the comfort of knowing that his contract partner is willing and able to perform his obligations. The circumstances as to when the failure to give such assurance may be treated as a repudiation are summarized in Section 251, paragraphs (1) and (2) of the Restatement (Second) of Contracts as follows:
>
>> 251. When a Failure to Give Assurance May be Treated as a Repudiation
>> (1) Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach under Section 243, the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.
>> (2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.

As the authors of Voyage Charters have observed:

> **7A.3** Under U.S. law, the owner may be entitled to consider the charter terminated if the charterer demonstrates by its statements or conduct that it will not or cannot perform. In such circumstances, the owner is permitted to conclude there has been an anticipatory repudiation of the charter. A repudiation by the charterer will not only excuse the owner from performance, but may give rise to a claim for damages. If the owner has reasonable grounds for believing that the charterer is not going to provide a cargo, the owner is

---

[56] SMA Award No 3650 (Bulow, Martowski, Siciliano (2000)

entitled to demand an assurance of performance by the charterer, the absence of which may be treated by the owner as a repudiation.[57]

Based on Duron's conduct as of July 1, 2020,  including multiple breaches of its obligations under the Charter and Addenda, Kondot had reasonable grounds to believe that Duron would continue to breach its contractual obligations.   In these circumstances, Kondot was fully justified in demanding, by email on July 1, 2020 (Exhibit 17) adequate assurance of performance, such assurance to include a payment on account of $500,000 and orders to proceed to the discharge port.   Considering the amount then owing to Kondot, the lengthy and continuing detention at Balboa,  and Duron's failure after almost three months to find a buyer for the cargo,  the amount of the requested payment on account was entirely reasonable.

Duron provided no satisfactory response to Kondot's request.  Instead, on July 2, 2020, Duron requested further patience from Kondot while it attempted to conclude a contract with EMAPA – a contract which would have involved the Vessel returning to Matarani.   At this point, it was apparent that any prospect by Duron to sell the cargo in Venezuela, if it had ever existed,  had fallen apart, that Duron had no firm sale of the cargo at all,  and that Duron was now attempting to resurrect a sale in Bolivia.  Based on Duron's response requesting patience until a sale to Bolivia was concluded and on Duron's  failure to make any payment on account, Kondot also had reasonable grounds to believe that without a firm sale of the cargo, Duron would be unable to pay the amount due and owing to Kondot.

On July 8, 2020, Duron again requested further patience from Kondot and promised that it would pay $150,000 on account the following day, July 9, 2020. No such payment was received. Finally, in the agreement reached through counsel on July 24, 2020, Duron promised that  by

---

[57] J. Cooke et al, *Voyage Charters* (3d Ed. 2014), Section 7.A.3 – 7.A.5. See also Section 21A.80 ("If a party is in doubt whether the charter has been repudiated, he is entitled to seek adequate assurances of performance from his contract partner.")

July 27, 2020, it would make an "unconditional payment on account to Kondot S.A. in the amount of $500,000…" Again, Duron failed to make the agreed payment.

Duron contends that its communications with Kondot regarding its efforts to conclude a new sale to EMAPA and the opening of a letter of credit by EMAPA were adequate assurance of performance. The Panel does not agree.

The letter of credit upon which Duron relies – the second one, which removed a documentary requirement for a post discharge inspection report -- was not opened until July 27, 2020, the same day that Duron breached its obligation to make an unconditional payment on account to Kondot of $500,000. The letter of credit was issued in favor of Duron as beneficiary and provided no assurance whatsoever that Kondot would be paid.

In order to draw upon the EMAPA letter of credit, Duron would have had to present, among other documents, "freight prepaid" bills of lading. Clause 54 of the Charter provides that freight prepaid bills of lading may only be released upon remittance of 100% of the freight.

For the proposed voyage from Balboa to Matarani, Duron had never paid any freight. Kondot had no obligation to issue freight prepaid bills of lading and, in the circumstances, it would have been imprudent for Kondot to do so. Issuing freight prepaid bills would have made it impossible for Kondot to defend against a demand at Matarani from the bill of lading holder for immediate discharge and delivery of the cargo, a lien upon which was the only security that Kondot had for payment of the freight.

There was no agreement between the parties for the Vessel to proceed to Matarani and, contrary to the contention of Duron, there were no valid orders from Duron to Kondot for the Vessel to do so. As counsel for Kondot observed during the hearing, the Charter was not a joint venture between Kondot and Duron and Kondot was not obliged to relinquish its rights or to expose itself to such risk by proceeding toward Matarani in the hope that it might assist Duron in concluding a sale.

18

Finally, any assurance that Kondot might otherwise  have obtained from communications about Duron's efforts to sell to EMAPA was, in any event,  dispelled by Duron's flat out failure to comply with its obligation to make the agreed unconditional payment on account of $500,000 by July 27, 2020.  That promise had been made through counsel only three days before with the express assurance that counsel had full authority to bind Duron.

Kondot was fully justified in treating Duron's breach of its obligation to make the agreed unconditional payment and its failure otherwise to comply with Kondot's reasonable request for adequate assurance as a repudiation of the contract by Duron. Upon that ground, Kondot was entitled to accept Duron's repudiation and to treat the contract as having been terminated, which it did on July 28, 2020.

**Material Breach and Repudiation of the Charter**

Kondot was also justified in accepting the repeated  breaches by Duron of  its contractual obligations as constituting the total and material breach and repudiation of the Charter.  When Kondot agreed to carry the cargo to Matarani, the discharge port declared by Duron,  Kondot had a reasonable expectation that after a relatively short voyage, the cargo would be discharged there and the contracted voyage would be at an end. That did not occur.  Duron lost its sale to Ecubol and failed to comply with its obligation to discharge the cargo in Matarani.

After the Vessel waited at Matarani for seven days,  the parties entered into Addendum No. 2 in which Duron agreed that the entire cargo would be discharged in Puerto Cabello.  That did not occur.  The Vessel arrived at Balboa on June 5 and has been there ever since. On July 2, 2020, it became apparent that, despite its promise to discharge the entire cargo in Puerto Cabello, Duron had no buyer for the cargo there or elsewhere in Venezuela and that, instead Duron was trying to conclude a contract with EMAPA which would have involved the Vessel returning to Matarani.

As of July 28, 2020, the breaches by Duron  had placed Kondot in a situation radically different from what it had contracted for.  The Vessel, which had been booked  for a relatively short voyage to Peru, had been waiting fully laden at anchor at Balboa for  nearly two months while Duron sought a buyer for the cargo.  The cargo, which was perishable, had been on board the Vessel for 82 days. HM, which had supplied the cargo to Duron, had not yet been fully paid and as owner of  the cargo, was holding  Kondot fully responsible for its care and custody.  Because of the long stay in tropical waters, there was reason for concern about marine growth on the Vessel necessitating underwater inspection and cleaning.  Kondot, which had the Vessel on time charter and was paying charter hire to its head owners, had not received for an extended period any income whatsoever from the employment of the Vessel.  As of July 28, Kondot was owed a substantial and growing  sum by a charterer which had failed to pay any part of what it owed for detention at Galveston, for the stay in Matarani, for the contracted voyage to Puerto Cabello or for the long detention at Balboa, had failed to make a promised $150,000 payment on account and had failed to make the agreed $500,000 unconditional payment on account due by July 27, 2020.

The breaches by Duron were fundamental and material, going to the very root of and constituting a repudiation of the Charter.  Kondot was entitled to accept those breaches as bringing the Charter to an end.

**The Panel has authority  to Grant Kondot's Emergency Application with a Partial Final Award**

It is historically well-established that arbitrators hearing disputes held in accordance with the SMA Rules have authority to decide emergency applications.  For instance, the 1978 partial final award in *The Endeavor* decided an overnight application as to whether owner or charterer was responsible for installing safety ladders while the Vessel was undergoing a shipyard survey. [58] And most recently, in July 2020, a partial final award was rendered in *The Alkimos* in response to owner's emergency motion (represented by Holland & Knight) declaring that owner had validly invoked a Venezuela sanctions clause when it demanded alternative voyage orders and that charterer had an obligation in response to provide alternative orders to owner. [59]  This capability is a unique feature of SMA practice as emphasized in the SMA Booklet *Maritime and Commercial Disputes Resolution* (2020 8th Ed.) which in the section entitled *Why arbitration under the SMA Rules,* states*:*

> **Speed**
>
> The immediate intervention of arbitrators is often required to preserve evidence and assets and/or to provide interim relief from an emerging quarrel that threatens the viability of an ongoing contract. SMA arbitration panels can and have speedily formed on an emergency basis to address such urgent needs and have rendered the needed declaratory relief within hours. In those special instances where time is of the essence, such rapidly convened panels can be invaluable. [60]

Contrary to the views expressed by counsel for Duron, the statement in the booklet does not purport to provide an exhaustive list of the urgent circumstances in which immediate intervention of a Panel might be required.

In this case, Kondot seeks the Panel's prompt decision on its right to terminate the Charter as the Vessel  remains anchored at Balboa fully loaded without valid discharge orders after over

---

[58] SMA No. 1152 (1977).

[59] SMA No. 4388 (July 3, 2020).

[60] P. 11.

100 days since loading 30,000 MT of a \$6.5 million perishable cargo at Houston on May 8, 2020.   The  relief requested by Kondot unquestionably qualifies as emergency relief.

The Panel has authority to issue a Partial Final Award declaring that Kondot was fully justified in accepting Duron's repudiation and terminating the Charter.   Kondot is entitled to have a prompt  declaration to that effect in the form of a judicially enforceable partial final award so that it can take subsequent measures that are urgently required – e.g. discharge and judicial sale of the cargo --- without peril or interference, such as a vessel arrest or other legal action by Duron based upon unfounded claims that the termination was wrongful.  Duron's contention that the Panel lacks authority to issue a partial final award in these circumstances or that it is somehow inappropriate to do so is entirely without merit.[61]

This has been a very-hard fought dispute between highly skilled counsel and all other arguments they advanced, while not specifically addressed in this decision, were carefully and respectfully considered but dismissed *sub silentio*.

---

[61]  See *Metallgesellschaft A.G. v. M/V CAPITAN CONSTANTE*, 790 F.2d 280 (2d Cir. 1986)

**Partial Final Award**

The Panel unanimously grants Kondot's emergency application and declares that Duron repudiated the Charter dated April 17, 2020 and Addenda and that Kondot was entitled to accept Duron's repudiation and terminate the Charter.

The Panel will remain constituted in accordance with the Parties' agreement to hear and decide their remaining claims and counterclaims arising under the Charter dated April 17, 2020. [62]

The Panel makes no award at this stage concerning the legal fees and expenses of the parties or the Panel with respect to this emergency application but will reserve making such award as part of a final award in this arbitration or until such other time as the Panel deems appropriate.

This Partial Final Award may be made a rule of the court in accordance with Clause 45 of the Charter dated April 17, 2020.

Louis Epstein

David Gilmartin

David W. Martowski

New York, New York
August 17, 2020

---

[62] Tr. 87 -88 [Oral Argument on August 12, 2020 - Messrs. Lennon and Foley].