UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KONDOT S.A.,

                            Petitioner,

                    v.                                    __OPINION AND ORDER__

DURON LLC,                                          21 Civ. 3744 (ER)

                            Respondent.

Ramos, D.J.:

On April 17, 2020, Kondot S.A. and Duron LLC entered into a contract relating to the

shipment of a cargo of wheat.  Doc. 3 at 3.  On July 2, 2020, Kondot commenced emergency

arbitration against Duron, alleging Duron breached the contract when it failed to comply with its

obligations to unload the cargo.  *Id.* at 5.  After hearing oral argument, the arbitrators issued a

partial final award granting Kondot's emergency application and declaring that Duron had

repudiated its contract with Kondot.  *See* Doc. 4-2.  On March 25, 2021, the arbitrators issued a

second partial final award, ordering Duron to provide pre-award security in the amount of

$2,000,000.00.  *See* Doc. 4-1.  Kondot then moved this Court to confirm and enforce the first and

second partial final awards.  *See* Doc. 3.  Duron did not oppose the motion.

On August 27, 2021, the arbitrators issued a third partial final award, granting Kondot

damages and fees totaling $2,078,382.50, and denying Duron's counterclaims as well as its

claims for fees and expenses.  Doc. 31-1 at 18.  On September 3, 2021, Kondot moved this Court

to confirm and enforce the third partial final award pursuant to the Convention on the

Recognition of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention") and

Chapter Two of the Federal Arbitration Act, 9 U.S.C. §§ 201 *et seq.* (the "FAA").  *See* Doc. 30; Doc. 33.  Duron then moved to vacate the third partial final award.  *See* Doc. 36.

For the reasons set forth below, Kondot's motion to confirm the third partial final award is GRANTED and Duron's motion to vacate the award is DENIED.[1]

## I.       BACKGROUND

### A.  Contractual Relationship

Kondot is an international ocean carrier with offices in Charlestown, Nevis.  Doc. 3 at 2. Duron is an international commodity trader with offices in Miami, Florida.  *Id.*  On April 17, 2020, Kondot and Duron entered into a charter concerning the shipment of a cargo of wheat for Duron.  *Id.* at 3.  The charter provided the wheat would be loaded in Galveston, Texas between April 23 and April 28, 2020, and gave Duron the option to unload the cargo in Matarani, Peru or Puerto Cabello, Venezuela.  *Id.*  On April 30, 2020, the parties entered into an addendum— Addendum No. 1—which changed the loading port from Galveston to Houston, where the cargo was expected to be ready on May 4, 2020, and provided for Duron to pay vessel detention fees per day pro rata.  *Id.* at 3-4.  Addendum No. 1 also increased the freight for both optional discharge ports.  *Id.*  On May 8, 2020, the cargo ship Hanze Gendt (the "Vessel") completed loading the wheat, and bills of lading were issued, identifying Matarani, Peru as the discharge port.  *Id.* at 4.  On May 11, 2020, Duron paid Kondot $793,656.68 in lump sum freight.  *Id.*

On May 23, 2020, the Vessel arrived at Matarani, Peru and waited for orders to discharge.  *Id.*  Duron, however, failed to comply with its obligation to discharge the cargo, as its sale of the wheat to its customer had fallen through.  *Id.*  On May 29, 2020, Duron and Kondot

---

[1] As the third partial final award incorporates the first and second partial final awards, Kondot's petitions to confirm those awards—Doc. 3, Doc. 19, Doc. 21, and Doc. 48—are denied as moot.

entered into Addendum No. 2 to the charter, which provided in part that: the Vessel would sail toward Puerto Cabello, Venezuela to discharge the entire cargo; Duron would pay Kondot a $365,600 lump sum in additional freight; that if the detention and lump sum freight were not paid by Duron into Kondot's bank account by the time the Vessel arrived at Balboa, Panama, the Vessel would drop anchor until the funds were received; and Kondot would not pay Panama Canal crossing fees until the funds were received and any transit delays would count as further detention to be paid by Duron to Kondot. *Id.*

On June 5, 2020, the Vessel arrived at Balboa, but Duron had failed to pay the lump sum freight to Kondot. *Id.* Therefore, the Vessel dropped anchor to await payment before crossing the Panama Canal toward Puerto Cabello. *Id.* On June 15, 2020, Kondot, through counsel, sent a demand for payment; however, Duron made no payment. *Id.* On June 18, 2020, Duron proposed to again change discharge ports to Maracaibo and Cumana, Venezuela. *Id.* On June 23, 2020, Kondot again wrote to Duron, urging Duron to make payment as agreed under Addendum No. 2; at this point, Kondot was due $620,143.83. *Id.* at 5.

On July 1, 2020, the Vessel was still at anchor in Balboa, and counsel for Kondot demanded that Duron provide adequate assurance of performance by remitting $500,000 to Kondot's bank account by 11:00 AM on July 2, 2020, and that Duron provide voyage instructions no later than noon on July 3, 2020, with the condition that if Duron failed to provide the demanded assurance, Kondot reserved the right to declare Duron in repudiatory breach of the charter, to terminate the charter party, and to commence legal proceedings to discharge and sell the cargo in mitigation of further loss and damage. *Id.* Having received no assurance of performance from Duron, Kondot demanded emergency arbitration on July 2, 2020, requesting a

partial final award confirming Kondot's right to terminate the charter.  Doc. 4-2 at 4, 8-9.  That same day, Kondot nominated its arbitrator.  *Id.*

Kondot initiated arbitration on July 2, 2020.  *Id.* at 9.  In the following days, Kondot continued to urge Duron to perform its contractual obligations.  *Id.*  On July 8, 2020, Duron requested further patience as it expected to have a signed contract for the cargo, at which time Duron's buyer would have 72 hours to open a letter of credit and Duron would be able to fully satisfy the outstanding cost and pay $150,000 by July 9, 2020.  *Id.*  On July 9, 2020, Kondot confirmed with Duron that the promised payment had not been received and repeated that Duron remained in repudiatory breach of the charter.  *Id.*  On July 16, 2020, Duron nominated its arbitrator and on the following day the two arbitrators appointed a third as panel chairman.  *Id.* at 3.

On July 24, 2020, the parties, through counsel, negotiated a further agreement pursuant to which Duron would make a $500,000 unconditional lump sum payment to Kondot within one business day of the agreement; Kondot, upon receipt, would make immediate arrangements to clean the Vessel's hull, re-bunker the Vessel at Balboa, and commence sailing toward Matarani; and the parties would execute a third addendum to the charter changing the discharge port back to Matarani, stipulating the amount of lump sum freight to be paid by Duron, and conferring on Kondot a lien on the cargo for all outstanding freight, detention, and demurrage.  *Id.* at 10-12.

However, Duron failed to make the additional payment and, thereby, failed to comply with the July 24 agreement.  Doc. 3 at 6.  On July 28, 2020, Kondot accepted Duron's total material breach and repudiation of the charter and began to arrange for the discharge and sale of the cargo.  *Id.*

4

### B.  First Partial Final Award

After receiving submissions from both parties, [2] the arbitrators heard oral argument on August 12, 2020.  Doc. 4-2 at 3.  On August 17, 2020, the arbitrators issued a unanimous partial final award ("first partial final award") granting Kondot's emergency application and declaring that Duron repudiated the April 17, 2020 charter and its addenda, as a result of which Kondot was entitled to accept Duron's repudiation and terminate the charter.  *Id.* at 23.  In particular, the arbitrators found

> Kondot was fully justified in treating Duron's breach of its obligation to make the agreed unconditional payment and its failure otherwise to comply with Kondot's reasonable request for adequate assurance as a repudiation of the contract by Duron.  Upon that ground, Kondot was entitled to accept Duron's repudiation and to treat the contract as having been terminated, which it did on July 28, 2020.

*Id.* at 19.

The arbitrators further found "Kondot was also justified in accepting the repeated breaches by Duron of its contractual obligations as constituting the total and material breach and repudiation of the Charter."  *Id.*  According to the arbitrators, Duron first breached the charter when it failed to comply with its obligation to discharge the cargo in Matarani; Duron next breached the charter when it failed to comply with its obligation to discharge the cargo in Puerto Cabello as the parties agreed in the second addendum to the charter.  *Id.*

The arbitrators found these breaches "had placed Kondot in a situation radically different form what it had contracted for."  *Id.* at 20.  As the arbitrators made clear,

---

[2] These submissions include Kondot's memorandum in support of its request for an emergency arbitration award confirming termination of the charter party (with 31 exhibits attached), Duron's response (with 23 exhibits attached), Kondot's reply (along with a witness statement), Duron's rebuttal statement (with a supplemental witness statement), and statements of facts from both parties.  Doc. 4-2 at 3.  According to the arbitrators, these submissions were "exceptionally detailed."  *Id.*

> [t]he Vessel, which had been booked for a relatively short voyage to Peru, had been waiting fully laden at anchor at Balboa for nearly two months while Duron sought a buyer for the cargo.  The cargo, which was perishable, had been on board the Vessel for 82 days. . . .  Kondot, which had the Vessel on time charter and was paying charter hire to its head owners, had not received for an extended period any income whatsoever from the employment of the Vessel.  As of July 28, Kondot was owed a substantial and growing sum by a charterer which had failed to pay any part of what it owed for detention at Galveston, for the stay in Matarani, for the contracted voyage to Puerto Cabello or for the long detention at Balboa, had failed to make a promised $150,000 payment on account and had failed to make the agreed $500,000 unconditional payment on account due by July 27, 2020.

*Id.*  As the arbitrators concluded, the "breaches by Duron were fundamental and material, going to the very root of constituting a repudiation of the Charter." *Id.*  As a result, the arbitrators found, "Kondot was entitled to accept those breaches as bringing the Charter to an end." *Id.*

Last, the panel addressed its authority to grant Kondot's emergency application:  "[i]t is historically well-established that arbitrators hearing disputes held in accordance with the [Society of Maritime Arbitrators ("SMA")] Rules have authority to decide emergency applications." *Id.* at 21.  "This capability," the arbitrators explained, "is a unique feature of SMA practice as emphasized in the SMA Booklet *Maritime and Commercial Disputes Resolution* . . . ." *Id.* According to the SMA Booklet,

> The immediate intervention of arbitrators is often required to preserve evidence and assets and/or to provide interim relief from an emerging quarrel that threatens the viability of an ongoing contract.  SMA arbitration panels can and have speedily formed on an emergency basis to address such urgent needs and have rendered the needed declaratory relief within hours.  In those special instances where time is of the essence, such rapidly convened panels can be invaluable.

*Id.*  In this case, the arbitrators explained, Kondot sought the "Panel's prompt decision on its right to terminate the Charter as," at the time, "the Vessel remain[ed] anchored at Balboa fully loaded without valid discharge orders after over 100 days since loading 30,000 MT of a $6.5 million perishable cargo at Houston on May 8, 2020." *Id.* at 21-22.  In light of this, the

arbitrators found Kondot's requested relief "unquestionably qualifie[d] as emergency relief" and made clear that Duron's contention that the "Panel lacks authority to issue a partial final award in these circumstances or that it is somehow inappropriate to do so is entirely without merit." *Id.* at 22.

The arbitrators concluded Kondot was "entitled to have a prompt declaration" that it was "fully justified in accepting Duron's repudiation and terminating the Charter" so that it could take subsequent measures—namely, discharge and judicial sale of the cargo—"without peril or interference, such as a vessel arrest or other legal action by Duron based on unfounded claims that the termination was wrongful." *Id.*

Though the arbitrators unanimously granted Kondot's emergency application—and declared Duron had repudiated the charter—in this first partial final award, they noted they would "remain constituted in accordance with the Parties' agreement to hear and decide their remaining claims and counterclaims . . . ." *Id.* at 23.

### C.  Second Partial Final Award

On March 25, 2021, the arbitrators ordered Duron to provide pre-award security in the amount of $2,000,000.00 ("second partial final award") by April 25, 2021. *See* Doc. 4-1.  This bond was to remain in effect pending the arbitrators' final determination of the merits of Kondot's claims.  *Id.*  In ordering such security, the arbitrators found, and the parties agreed, that the arbitrators were empowered to order pre-award security in accordance with Section 30 of the SMA Rules.  Doc. 4-1 at 6.  The arbitrators further weighed the criteria of:  (a) whether the moving party has established a likelihood of success on the merits; (b) the opposing party's financial condition; and (c) whether there are other means of securing the claim.  *Id.*

As to the first criterion, the arbitrators found that "Kondot has overwhelmingly established a likelihood of success on the merits of its claims." *Id.* at 7.  The merits of Kondot's case were carefully examined by the arbitrators in the first partial final award where the arbitrators were unanimous in granting Kondot's emergency application and declaring that Duron repudiated the charter and addenda. *See* Doc. 4-2.  As to the second criterion, the arbitrators determined that "Duron's financial difficulties were only too evident in its chronic failure to meet its obligations throughout the performance of the Charter . . . ." Doc. 4-1 at 8.  As to the third criterion, the arbitrators found that "[w]hile Kondot diligently sought other means of security by attachment proceedings in New York, Texas, Virginia, and Panama, its success was limited to $203,000." *Id.*  Kondot is claiming damages of $826,651.66 from the Matarani detention until Duron's repudiation of the Charter and $1,268,794.73 suffered from Duron's repudiation until the completion of the voyage to Houston, plus an estimated $300,000 in legal and arbitral fees. *Id.* at 5.

In granting Kondot's application for pre-award security, the arbitrators repeated their previous findings—set out in the first partial final award—on Duron's liability.  Though the arbitrators ordered Duron to post the $2,000,000.00 bond by April 25, 2021, Duron has yet to do so.  Doc. 7 at 5.

On April 27, 2021, Kondot moved this Court to confirm and enforce the first and second partial final awards; the first award, issued on August 17, 2020, granted Kondot's emergency application and declared Duron had repudiated the charter, and the second award, issued on March 25, 2021, ordered Duron to provide $2,000,000 in pre-award security. *See* Doc. 3.  Duron did not oppose the motion, and on July 8, 2021, Kondot moved for summary judgment. *See* Doc. 21.

### D.  Third Partial Final Award

After granting Kondot's application for pre-award security, the arbitrators remained constituted to hear and decide the remaining claims and counterclaims, and received submissions from both parties relating to Kondot's claim for damages, Duron's counterclaims for damages, and, from both parties, claims for attorneys' fees and expenses.  Doc. 31-1 at 4.  The arbitrators reviewed these submissions as well as transcripts from the parties' virtual arbitration hearings—the first hearing, on August 12, 2020, and two subsequent hearings on January 26, 2021, and February 9, 2021.  *Id.* at 4-5.

On August 27, 2021, the arbitrators issued a unanimous partial final award ("third partial final award") granting Kondot pre-termination damages of $832,344.43 and post-termination damages of $942,266.57.  Doc. 31-1 at 16.  The arbitrators also awarded Kondot $208,771.50 in attorneys' fees and costs, and $95,000.00 in arbitration fees.  *Id.* at 17.  In total, the arbitrators awarded Kondot $2,078,382.50.  *Id.* at 18.  The arbitrators denied Duron's counterclaims,[3] noting they "depend, in large measure, on a version of the facts that has already been rejected by the Panel . . . ."  *Id.* at 16, 18.  The arbitrators also denied Duron's claims for attorneys' fees and expenses.  *Id.* at 18.

### E.  Motion to Vacate

On September 29, 2021, Duron petitioned this Court to vacate the third partial final award, *see* Doc. 36, even though it did not oppose confirmation of the first and second partial final awards.  In its petition, Duron argues that the arbitrators, in granting Kondot's emergency application, failed to follow the parties' agreed-upon procedure and denied Duron the right to

---

[3] Specifically, Duron argues that Kondot breached the charter, that the charter's confidentiality clause interfered with Duron's business relationships, and that Kondot engaged in misconduct by making misrepresentations to Duron's business counterparties.  Doc. 31-1 at 17.

present its case on the merits, and that the third partial final award is contrary to public policy. Doc. 38 at 9, 14, 16.

## II.   LEGAL STANDARDS

"Normally, confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court, and the court must grant the award unless the award is vacated, modified, or corrected." *D.H. Blair & Co. v. Gottdierner*, 462 F.3d 95, 110 (2d Cir. 2006) (citation omitted).  The Second Circuit has recognized that "an extremely deferential standard of review" is appropriate in the context of arbitral awards in order "[t]o encourage and support the use of arbitration by consenting parties." *Porzig v. Dresdner, Kleinword, Benson, North Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007).  "The arbitrator's rationale for an award need not be explained, and the award should be confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case." *D.H. Blair*, 462 F.3d at 110 (quoting *Barbier v. Shearson Lehman Hutton, Inc.*, 948 F.2d 117, 121 (2d Cir. 1991) (internal quotation marks omitted)).  Accordingly, "[o]nly 'a barely colorable justification for the outcome reached' by the arbitrator[] is necessary to confirm the award." *Id.* (quoting *Landy Michaels Realty Corp. v. Local 32B-32J, Serv. Emps. Int'l Union*, 954 F.2d 794, 797 (2d Cir. 1992)).

"When a party seeks confirmation of an arbitral award under the New York Convention, '[t]he court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.'" *Albtelecom SH.A v. UNIFI Commc'ns, Inc.*, No. 16 Civ. 9001 (PAE), 2017 WL 2364365, at *4 (S.D.N.Y. May 30, 2017) (quoting 9 U.S.C. § 207).  "Article V of the Convention specifies seven exclusive grounds upon which courts may refuse to recognize an award." *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005); *see also CBF Industria de Gusa*

*S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 76–77 (2d Cir.), *cert. denied*, —— U.S. ——, 138 S.Ct.

557, 199 L.Ed.2d 437 (2017).  These grounds are:

> (a)  The parties to the agreement . . . were . . . under some incapacity, or the said agreement is not valid under the law . . .; or
>
> (b)  The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or
>
> (c)  The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration . . .; or
>
> (d)  The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties . . . ; or
>
> (e)  The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, the award was made.

Convention art. V(1).  Enforcement may also be refused if "[t]he subject matter of the difference

is not capable of settlement by arbitration," or if "recognition or enforcement of the award would

be contrary to the public policy" of the country in which enforcement or recognition is sought.

Convention art. V(2).

There is a separate standard for the vacatur of an arbitral award.  Under the FAA, arbitral

awards "may only be vacated on extremely limited grounds."  *Ecopetrol S.A. v. Offshore Expl.*

*and Prod. LLC*, 46 F. Supp. 3d 327, 340 (S.D.N.Y. 2014) (citing *Hall St. Assoc's, LLC v. Mattel,*

*Inc.*, 552 U.S. 576, 588 (2008)).  The party moving to vacate an award bears "the heavy burden

of showing that the award falls within a very narrow set of circumstances delineated by statute

and case law."  *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d

Cir. 2003)); *see Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010) (holding

that a party seeking vacatur of an arbitrator's decision "must clear a high hurdle").  Under the FAA, a court may vacate an award:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).  In addition, as "judicial gloss" on these specific grounds for vacatur, the Second Circuit has held that "the court may set aside an arbitration award if it was rendered in manifest disregard of the law." *Schwartz v. Merrill Lynch & Co., Inc.*, 665 F.3d 444, 451 (2d Cir. 2011) (internal quotation marks omitted).

## III.    DISCUSSION

Though Duron petitions the Court to vacate the third partial final award, Duron does not—in its motion or in its reply—set out or apply the proper standard for vacatur.  Duron does not address any of the four grounds for vacatur set out in the FAA, nor does it argue the award was rendered in manifest disregard of the law.  Instead, Duron moves to vacate the third partial final award pursuant to various provisions of Article V of the New York Convention.  This is not the standard.  While the New York Convention provides bases upon which a court may *refuse* confirmation of an award, it does not provide a basis for *vacatur* of an award.  *See KT Corp. v. ABS Holding, Ltd.*, No. 17 Civ. 7859 (LGS), 2018 WL 3364390, at *2-3 (S.D.N.Y. July 10, 2018), *aff'd*, 784 App'x 21 (2d Cir. 2019); *PDV Sweeny, Inc. v. ConocoPhillips Co.*, No. 14 Civ. 5183 (AJN), 2015 WL 5144023, at *5-6 (S.D.N.Y. Sept. 1, 2015), *amended*, No. 14 Civ. 5183

(AJN), 2015 WL 9413880 (S.D.N.Y. Dec. 21, 2015), *aff'd*, 670 App'x 23 (2d Cir. 2016).  Here, Duron "conflate[s] two distinct issues before the Court:  the power to vacate an award and the power to recognize, confirm, and enforce an award . . . ."  *PDV Sweeny*, 2015 WL 5144023, at *5-6.

In any event, the Court will consider Duron's arguments as grounds for refusal—not as bases for vacatur—as Duron objects to the third partial final award pursuant to three of the seven grounds for refusal set out in Article V of the New York Convention.[4]  The Court will address each of these three grounds in turn.

### a.  Arbitral Procedure

First, Duron opposes the confirmation of the third partial final award under Article V(1)(d) of the Convention, which provides that a court may refuse to recognize an arbitration award where "the composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties . . . ."  Convention art. V(1)(d); *see also Encyclopaedia Universalis*, 403 F.3d at 91 (noting that, while enforcement of arbitral awards under Article V(1)(d) might "exalt[] form over substance . . . the fact [remains] that the parites explicitly settled on a form and the New York Convention requires that their commitment be respected").

---

[4] As stated above, the party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses under the New York Convention applies.  Art. V(1); *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.,* 156 F.3d 310, 313 (2d Cir. 1998).  The burden is a heavy one, as "the showing required to avoid summary confirmance is high."  *Yusuf Ahmed Alghanim & Sons v. Toys 'R' Us, Inc.,* 126 F.3d 15, 23 (2d Cir. 1997) (quoting *Ottley v. Schwartzberg,* 819 F.2d 373, 376 (2d Cir. 1987)).  Given the strong public policy in favor of international arbitration, *see Compagnie Noga D'Importation et D'Exportation, S.A. v. Russian Federation,* 361 F.3d 676, 683 (2d Cir. 2004), review of arbitral awards under the New York Convention is "very limited . . . in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation."  *Yusuf Ahmed Alghanim,* 126 F.3d at 23 (quoting *Folkways Music Publishers, Inc. v. Weiss,* 989 F.2d 108, 111 (2d Cir. 1993)).

Here, Duron argues that the parties did not agree to any expedited procedure, and, because the arbitrators conducted an emergency arbitration, they failed to act in accordance with the parties' agreement.  In support, Duron cites to the dispute resolution clause in the parties' charter, which provides in part that the arbitration "is to be conducted in accordance with the SMA.  Doc. 38 at 10.  Duron argues that the SMA Rules "do not provide a mechanism or procedure for the relief Kondot sought," and are instead "silent on emergency relief . . . ." *Id.* at 12.

But, as stated above, the arbitrators—in response to these same arguments from Duron—made clear their authority to grant Kondot's emergency application, explaining that "[i]t is historically well-established that arbitrators hearing disputes held in accordance with the SMA Rules have authority to decide emergency applications," and citing to the SMA booklet on maritime and commercial dispute resolution.  Doc. 4-2 at 21.  As the booklet provides, "[t]he immediate intervention of arbitrators is often required to preserve evidence and assets and/or to provide interim relief from an emerging quarrel that threatens the viability of an ongoing contract. . . .  In those special instances where time is of the essence, such rapidly convened panels can be invaluable." *Id.*  In this case, as explained above, Kondot sought emergency arbitration as, at the time, the Vessel was anchored at Balboa fully loaded after over 100 days with $6.5 million of perishable wheat. *Id.* at 21-22.  In light of this, the arbitrators found Kondot's requested relief "unquestionably qualifie[d] as emergency relief" and that Kondot was "entitled to have a prompt declaration" that it was "fully justified in accepting Duron's repudiation and terminating the Charter." *Id.* at 22.

14

Duron counters that because Kondot terminated the charter on July 28, 2020—*before* the arbitrators issued the emergency arbitration award[5]—Kondot no longer needed "urgent temporary relief."  Doc. 38 at 12-13.  But, here, Duron misses the point:  Kondot asked the arbitrators to declare it was *justified in* or, put another way, *entitled to* accept Duron's repudiation and terminate the charter so that it could take subsequent measures—namely the discharge and judicial sale of the cargo—"without peril or interference, such as vessel arrest or other legal action by Duron based on unfounded claims that the termination was wrongful." Doc. 4-2 at 22.  In other words, Kondot was not waiting for an award declaring it could terminate the charter but was instead waiting for an award declaring it could take "subsequent measures" without interference from Duron.  Kondot's need for this specific relief—which would allow it to discharge and sell the cargo—remained urgent even after it terminated the charter.

In light of this, the Court agrees that the arbitrators had good reason to grant Kondot's emergency application, and finds unconvincing Duron's argument that the arbitrators' reliance on the SMA guidebook, as well as its adherence to "well-established" SMA practice, is counter to the SMA Rules (which, while silent on emergency arbitration, do not prohibit it).  At bottom, the parties' agreement required that the arbitration be conducted in accordance with SMA Rules, but Duron cannot point to any provision of the SMA Rules that forbids emergency arbitration.

However, even if the Court accepts Duron's claim that the emergency arbitration was not conducted in accordance with the parties' agreement—because such procedure is not explicitly set out in the SMA Rules—Duron did not object to or move to vacate the award issued as a result of this emergency arbitration.  As explained above, the arbitrators issued their first partial final

---

[5] As set out above, Kondot imitated emergency arbitration on July 2, 2020, and terminated the charter—after several attempts at resolution—on July 28, 2020.  The arbitrators heard oral argument on August 12, 2020 and issued the first partial final award on August 17, 2020.

award on August 17, 2020—after hearing emergency oral argument.  The arbitrators then issued

a second partial final award, granting Kondot pre-award security, on March 25, 2021.  Kondot

moved this Court to confirm and enforce the first and second partial final awards, and, notably,

Duron did *not* oppose confirmation of or move to vacate either award.

Thus, even if the Court found that the arbitrators did not follow the parties' agreed-upon

procedure in issuing the first partial final award, the arbitrators ultimately did follow the parties'

agreed-upon procedure in issuing the *third* partial final award, which is the award Duron now

moves to vacate.  Ahead of issuing their third partial final award, the arbitrators held two more

hearings, and the parties exchanged extensive briefing relating to damages and counterclaims.

Doc. 31-1 at 5.  And in reaching the third partial final award, the arbitrators reviewed transcripts

from all hearings as well as all the parties' submissions.  *Id.*

In any event, as there is more than a "barely colorable justification" to support a finding

that the arbitrators conducted the arbitration in accordance with the parties' agreed-upon

procedure, *see D.H. Blair*, 462 F.3d at 110, Duron's argument pursuant to Article V(1)(d) fails.

### b.  Duron's Right to Present its Case

Next, Duron argues the Court should refuse to recognize the award because it was denied

the right to present its case on the merits pursuant to Article V(1)(b) of the Convention—which

provides that a court may refuse to recognize an award where the "party against whom the award

is invoked was not given proper notice . . . or was otherwise unable to present his case."  *See*

Doc. 38 at 16.  In its argument urging the Court to refuse to confirm the award pursuant to

Article V(1)(b), Duron fails to explain how courts in this circuit consider the provision and how

it applies to Duron's alleged facts.  Indeed, Duron only cites to one case here, and this case, in turn, does not mention Article V(1)(b), let alone any provision of the New York Convention.

In any event, Duron's argument under Article V(1)(b) fails.  As the Second Circuit has explained, Article V(1)(b) protects "the fundamental requirement of due process," which is "the opportunity to be heard at a meaningful time and in a meaningful manner." *Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 146 (2d Cir. 1992) (internal citations and quotation marks omitted).  In arguing that the arbitrators denied it due process, Duron faces a heavy burden.  Courts may vacate an arbitral award "only where there is a denial of 'fundamental fairness.'" *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 103-04 (quoting *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997)).

Here, it is clear from the partial final awards—as well as from Duron's papers—that Duron had ample opportunity to be heard regarding all the issues in the arbitration and that it took full advantage of that opportunity.  Duron argues it was "entitled to a full arbitration proceeding conducted . . . in a manner that preserved its due process rights," and that, in particular, it was "entitled to prepare and bring counterclaims and to submit evidence both in its defense and to support its counterclaims."  Doc. 38 at 14.  But Duron did prepare and bring counterclaims and did submit evidence supporting those counterclaims. *See* Doc. 31-1 at 5.[6] Indeed, Duron does not argue it was denied an opportunity to present evidence or otherwise to be heard, or even that the arbitrators did not consider its evidence, but instead objects to *how* the arbitrators considered its evidence, including its counterclaims.  Specifically, Duron contends

---

[6] As the arbitrators explained, the parties exchanged several submissions relating to Duron's counterclaims, including Duron's Statement of Counterclaims, Kondot's Motion to Dismiss Duron's Counterclaims, Duron's Brief in Opposition to Kondot's Motion to Dismiss Duron's Counterclaims, and Kondot's Reply to Duron's Opposition to its Motion to Dismiss Duron's Counterclaims.  Doc. 31-1 at 5.

that the arbitrators based their third partial final award only on findings set out in the first partial final award, which, Duron claims, is an interim or emergency award.  Doc. 38 at 14-16.  But this is not the case.

As the arbitrators made clear, ahead of issuing the third partial final award, they "thoroughly reviewed" the transcripts from all virtual hearings—including those hearings held after they issued the first partial final award—as well as the parties' "exhaustive submissions," including those submissions relating to Duron's counterclaims, all of which were submitted after the issuance of the first partial final award.  Doc. 31-1 at 5.  In reaching their conclusions in the third partial final award, the arbitrators explained, they "thoroughly considered all of counsel's detailed contentions." *Id.*  In any event, Duron also had ample opportunity to present its case at the emergency arbitration hearing:  both parties exchanged briefs ahead of the hearing[7] and, at the hearing—which was nearly three hours long—"Duron's attorneys were given every opportunity to raise any and all issues . . . ." *Id.*

None of this amounts to a denial of fundamental fairness, and Duron fails to show that it was denied any opportunity to be heard.  "It is well settled that procedural questions that arise during arbitration, such as which witnesses to hear and which evidence to receive or exclude, are left to the sound discretion of the arbitrator and should not be second-guessed by the courts." *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 545 (2d Cir. 2016) (citing *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 40 (1987)).  "Arbitrators are accorded great deference in their evidentiary determinations, and 'need not follow all the niceties observed by the federal courts.'" *Kolel Beth*, 729 F.3d at 107

---

[7] See note 2, above.

(quoting *Bell Aerospace Co. Div. of Textron, Inc. v. Local 516*, 500 F.2d 921, 923 (2d Cir. 1974)).  And although the panel "must give each of the parties to a dispute an adequate opportunity to present its evidence and argument," it is "not required to hear all the evidence proffered by a party." *Id.* (quoting *Tempo Shain*, 120 F.3d at 20).  There is no question that Duron was afforded ample opportunities to present its evidence and argument.  As such, Duron's invocation of Article V(1)(b) is unavailing.

### c.  Contrary to Public Policy

Last, Duron opposes confirmation of the third partial final award under Article V(2)(b) of the Convention, which provides that a court may refuse to recognize an award if "recognition or enforcement of the award would be contrary to the public policy" of the country in which enforcement or recognition is sought.  Convention art. V(2).[8]  "[T]his public policy exception is to be construed very narrowly and should be applied only where enforcement would violate our most basic notions of morality and justice."  *Europcar Italia, S.p.A v. Maiellano Tours, Inc.*, 156 F.3d 310, 315 (2d Cir. 1998) (internal citations and quotation marks omitted).  Moreover, the public policy at stake must be "well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests."  *Yukos Capital S.A.R.L. v. OAO Samaraneftegaz*, 963 F.Supp.2d 289, 299 (S.D.N.Y. 2013) (internal citations and quotation marks omitted).

Duron argues that Addendum No. 2 to its agreement with Kondot was procured through duress and, because of this, recognition of any award based on Addendum 2 would violate public policy.  Doc. 38 at 16.  Duron fails to set out the proper standard for construing the Convention's

---

[8] Again, Duron misstates the law by characterizing Article V(2)(b) as "empower[ing] this Court to *vacate* an award . . . ."  Doc. 38 at 16 (emphasis added).

public policy exception—namely, that it should be applied "only where enforcement would violate our most basic notions of morality and justice," *Europcar*, 156 F.3d at 315, and that the public policy at stake must be "well defined and dominant" as well as "ascertained by reference to the laws and legal precedents . . . ." *Yukos*, 963 F.Supp.2d at 299.  Instead, Duron writes only that "[i]t is well established that contracts entered into under duress 'contravene the public policy of the nation.'" Doc. 38 at 16.

Duron argues that, despite the "significant deference that courts afford arbitration awards in many other areas," the Court should conduct a non-deferential review of the duress question, noting an arbitration panel's rejection of a duress defense has no binding effect on the reviewing court.  Doc. 38 at 17.  In support, Duron cites to *Transmarine Seaways Corp. v. Marc Rich & Co. A.G.*, 480 F. Supp. 352 (S.D.N.Y. 1979).  *Transmarine*, in turn, cites to *Botany Industries, Inc. v. New York Joint Board*, 375 F. Supp. 485 (S.D.N.Y. 1974), for the contention that a court, in considering public policy as a basis for refusing to a recognize an award, is "required to make its own, independent evaluation."  480 F. Supp. at 358 (citing *Botany*, 375 F. Supp. at 491 n.8.).

But the Second Circuit vacated *Botany*—a detail Duron ignores—and in doing so expressly noted that because "arbitration was the dispute-settling mechanism agreed upon by the parties, the decision of the arbitrator, insofar as it interprets the contract and details the rights and obligations of the parties, seems entitled to some consideration," and, therefore, the court "should give the arbitration award such weight as may be appropriate under the circumstances." *Robb v. New York Joint Bd., Amalgamated Clothing Workers of America*, 506 F.2d 1246, 1274 n.1 (2d Cir. 1974).  In other words, though Duron relies on *Botany* in urging the Court to conduct a *de novo* review of its duress claims without giving any deference to the findings of the arbitrators, the Second Circuit specifically rejected that portion of the *Botany* decision in *Robb*.

In light of this, the Court gives deference to the arbitrators, who, after reviewing numerous submissions from both parties—including submissions relating to the enforceability of Addendum No. 2—and after presiding over multiple hearings—during which the parties had ample opportunity to discuss Addendum No. 2—addressed and then rejected Duron's arguments relating to duress. *See* Doc. 31-1 at 5-9.

At the outset, the arbitrators noted that while Duron had numerous opportunities to raise any issue relating to the enforceability of Addendum No. 2, Duron did not challenge its enforceability at the emergency hearing on August 12, 2020—which involved nearly three hours of testimony—or in its papers submitted ahead of that hearing. Doc. 31-1 at 5-6. Nor did Duron object to Addendum No. 2 at the hearing on January 26, 2021. *Id.* at 7. Instead, as the arbitrators explained, Duron waited until "this advanced stage of these proceedings"—until it put forth its arguments relating to damages—to raise issue with Addendum No. 2 for the first time.

As the arbitrators further explained, the August 12, 2020 oral argument allowed Duron "every opportunity to raise any and all issues, including specifically any issues with reference to Addendum No. 2." *Id.* at 5-6. But during that argument, Duron "never contend[ed] that Addendum No. 2 . . . was unenforceable or invalid for any reason." *Id.* at 6. Indeed, as the arbitrators recognized, throughout that oral argument, Duron explained how and why it negotiated and entered into Addendum No. 2, but did not once suggest that it had been coerced or forced into agreeing to the addendum. *Id.* at 6. It is worth noting, here, that the parties entered into Addendum 2 *at Duron's request*: after Duron failed to discharge the cargo at Matarani, Peru—as its sale of the wheat to its customer had fallen through. It was Duron who requested that the parties enter into Addendum No. 2, which provided, in part, for Kondot to carry the cargo to Puerto Cabello, Venezuela from Matarani, Peru. Doc. 41 at 13.

21

In any event, the arbitrators considered Duron's arguments relating to Addendum No. 2 and found them unavailing, determining that Addendum No. 2 was not agreed to under duress or coercion.  Doc. 31-1 at 9.  The arbitrators noted that, in considering this issue, they gave "a great deal of weight to the testimony of Kondot's [witness] who testified . . . at two days of hearings under intense cross examination" from Duron on a range of issues, including Addendum No. 2. *Id.* at 7.  After reviewing "all the evidence" and in acknowledgment of the "heavy burden" required to avoid a contract on grounds of duress, *see Davis & Assocs., Inc. v. Health Mgmt. Servs., Inc.*, 168 F. Supp. 2d 109, 114 (S.D.N.Y. 2001), the arbitrators concluded that

> Duron . . . failed to establish that Kondot's actions were wrongful or that Duron had no choice but to agree [to the terms of Addendum No. 2].  There was no duress or coercion in the negotiation of Addendum No. 2 which was freely negotiated and agreed by all the parties.

*Id.* at 9.

Even if the Court were to consider Duron's duress argument without deferring to the arbitrators, the Court agrees with Kondot that Duron has waived any claim of duress not only by failing to disaffirm Addendum No. 2 but by seeking relief from the arbitrators on the basis of Addendum No 2.[9]  *See Kephart v. Certain Underwriters at Lloyd's of London*, 427 F. Supp. 3d 508, 517-18 (S.D.N.Y. 2019) ("because duress renders contracts voidable, rather than void, 'the person claiming duress must act promptly to repudiate the contract . . . or he will be deemed to have waived his right to do so'") (quoting *United States v. Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 88 (2d Cir. 2011)); *see also Dirose v. PK Mgmt. Corp.*, 691 F.2d 628, 634 (2d Cir. 1982).

---

[9] Specifically, Duron argued in its response to Kondot's request for an emergency arbitration award that Kondot acted contrary to the parties' agreement in Addendum No. 2.  Doc. 4-2 at 13.

As stated above (and as the arbitrators made clear), Duron, though it was provided several opportunities over the course of several months to raise any concern with Addendum No. 2, waited until the parties presented arguments relating to damages to introduce its duress claim for the first time.  *See* Doc. 31-1 at 4.  Kondot argues this delay amounts to a waiver of any duress argument, *see* Doc. 41 at 15-16, and the Court agrees.

In response to Kondot's waiver argument, Duron argues it could not have waived its claim of duress, because at the time of the first hearing, Duron "did not have the evidence available to assess the duress argument" and "did not know of the potential duress argument." Doc. 42 at 10.  This argument defies credulity for a number of reasons.  First, logic and common sense compel the conclusion that if one were truly under duress, one would know it in the moment.  Second, it is unclear what evidence Duron would need to "assess" its argument that an addendum it requested and entered into was, somehow, procured through duress.  On this point, Duron claims its counsel had not had an ability to "review the correspondence that had taken place between Kondot and the broker which had arranged the vessel charter," *id.*, but does not further explain what this correspondence is or how it could help Duron determine, after the fact, that it had entered Addendum No. 2 under some form of duress.  Even assuming Duron did need this evidence to further its claim of duress, this does not explain how Duron did not have enough time between May 29, 2020—when it entered into Addendum No. 2—and August 12, 2020— when the arbitrators held emergency oral argument—to locate and review this evidence.  Or, even if the Court looks only to the date Duron retained counsel—July 16, 2020, *see* Doc. 4-2 at 10—Duron still had ample time to prepare a duress defense ahead of oral argument.

Second, given that Duron submitted to the arbitrators "exceptionally detailed papers" in August, 2020—ahead of the emergency arbitration—it is hard to believe Duron left out this

particular argument.  Duron's submissions to the arbitrators included (1) its August 3, 2020

response (with 23 exhibits attached) to Kondot's request for an emergency arbitration award, (2)

its August 7, 2020 rebuttal statement (with a supplemental witness statement attached), and (3) a

"detailed chronological statement of facts."  Doc. 4-2 at 3.  None of these submissions included

any reference to alleged duress in the procurement of Addendum No. 2.

Thus, in light of the deference owed to the arbitrators' decision, the Court's obligation to

"very narrowly" construe the Convention's public policy exception, and Duron's failure to

promptly raise its duress defense, the Court finds Duron has failed to prove the public policy

defense, under Art. V(2)(b), applies.

## IV.    CONCLUSION

As Duron has failed to show that any of the grounds for refusal of recognition of the third

partial final award applies, and as this Court "shall confirm the award unless it finds one of the

grounds for refusal . . . specified in the [New York] Convention," Duron's motion to vacate the

award is DENIED and Kondot's motion seeking confirmation of the award is GRANTED.  The

clerk of court is respectfully directed to terminate the motions, Docs. 3, 19, 21, 30, 33, and 48,

and to close the case.

It is SO ORDERED.

Dated:    Feburary 22, 2022
          New York, New York

_____
                EDGARDO RAMOS, U.S.D.J.